## In re ELIAS.

(District Court, E. D. North Carolina. March 15, 1917.)

No. 536.

1. BANKRUPTCY ⬗136(2)—POWERS OF COURT—ENFORCING ORDER—IMPRISON-MENT FOR CONTEMPT.

Even if Bankr. Act July 1, 1898, c. 541, § 2 (13), 30 Stat. 545 (Comp. St. 1913, § 9587), conferring on courts the power to enforce obedience by bankrupts of all lawful orders by fine or imprisonment, and section 41 (section 9625), conferring on the judge the power to enforce obedience to lawful orders made by the referee, gave the judge power to imprison a bankrupt for contempt by way of punishment, as distinguished from imprisonment to compel obedience, for disobedience to an order to turn property over to the trustee, that power should not be exercised, in view of Bankr. Act, § 29 (section 9613), which makes it a criminal offense for the bankrupt to withhold property from his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

2. BANKRUPTCY ⬗136(2)—CONTEMPT—ORDER OF REFEREE—HEARING BEFORE JUDGE.

On a hearing before the District Judge on an order to show cause why a bankrupt should not be committed for contempt for refusing to obey a lawful order of the referee to turn certain property over to the trustee, the judge is not bound by the referee's finding that the bankrupt had the property in his possession or under his control, though the bankrupt filed no petition to revise the order, and there was no showing that he had lost the power to comply with the order since it was entered.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

3. BANKRUPTCY ⬗136(2)—CONTEMPT—ORDER OF REFEREE—PROCEEDINGS TO ENFORCE—EVIDENCE CONSIDERED.

In proceedings to commit a bankrupt for contempt for refusing to obey an order to turn property over to the trustee, the judge must, giving due weight to the findings of fact by the referee, examine for himself all the evidence in regard to the bankrupt's conduct, and all other relevant evidence before and since the referee's order.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

4. BANKRUPTCY ⬗136(2)—CONTEMPT—PROCEEDINGS—FINDINGS OF FACT—NECESSITY.

Because of the drastic character and the summary procedure in contempt cases, the law requires the court to find the facts upon which orders of imprisonment for contempt are made.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

5. BANKRUPTCY ⬗136(2)—RIGHTS OF TRUSTEE—PROPERTY WITHHELD BY BANKRUPT—POSSESSION—PRESUMPTION.

The fact that a bankrupt had considerable property at the time of bankruptcy, which he did not turn over to the trustee, does not create a presumption that at the time the referee made an order, 10 months later, requiring him to deliver the property to the trustee, he still had it, or the proceeds of the sale thereof, sufficiently strong to warrant his imprisonment for contempt until he obey the order.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

6. BANKRUPTCY ⬗136(2)—REMEDIES OF TRUSTEE—ORDER FOR DELIVERY OF PROPERTY—REQUISITES.

An order of the referee, requiring the bankrupt to deliver property to the trustee, should find what specific property is in the bankrupt's possession, and, with reasonable certainty, specify the property he is ordered

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to deliver, or, if money is to be paid, specify the amount and source from which it is derived.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235.]

In Bankruptcy. In the matter of J. A. Elias, bankrupt. Proceeding in contempt against the bankrupt for failure to obey an order of the referee to deliver to the trustee property found by the referee to be in the possession or under the control of the bankrupt. Order of commitment denied.

Moe Levy, of Norfolk, Va., and W. L. Knight, of Weldon, N. C., for trustee.

T. T. Thorne, of Rocky Mount, N. C., for bankrupt.

CONNOR, District Judge. The referee certified that, after hearing the examination of the bankrupt and other evidence, on February 1, 1917, he found as a fact that the bankrupt was withholding from the trustee and concealing from his creditors $4,047.90 in merchandise, or its equivalent in money, upon which finding he made an order requiring him on or before 12 o'clock noon of February 15, 1917, to pay to A. B. Stainback, trustee, the said sum. A copy of the order and the findings of fact were served on the bankrupt, delivered to his attorneys, and certified to the judge. The bankrupt failed to comply with the order, whereupon notice was issued to and served upon him, directing that he show cause before the judge, at Raleigh, on March 6, 1917, which, at the request of his attorney, was continued until Saturday, March 10, 1917. The bankrupt appeared in person, and was represented by counsel. He filed an answer averring his inability to comply with the order of the referee, and further averring that he has not, in his possession or under his control, said sum, either in money or merchandise, or any part thereof. He says:

"The entire assets, money, and property belonging to this respondent, at the time he filed petition in bankruptcy, was, so far as he could do so, correctly set out in the schedule filed by him at the time of his adjudication as a bankrupt."

In his answer he sets out that he is a Syrian, born near Mt. Lebanon, and, until he came to America, was unable to speak the English language; that, since coming, he has learned to speak, but is unable to write, English. He further says that he was unable to keep books, or make any record of his business; that his sister, a young woman about 21 years of age, kept such books and made such records as she was able, regarding his business; that she is of very limited education. The petition in bankruptcy was filed, and respondent adjudged bankrupt, May 4, 1916. The case was referred to Jas. R. Gaskill, referee, and an examination of the bankrupt had before him (the examination and other evidence taken before him is certified by the referee). Mr. Gaskill died pending the proceedings in the cause. It was referred to Jos. B. Cheshire, Jr., Esq., referee, who proceeded to further examine the bankrupt and hear further evidence. He has made a very thorough and exhaustive examination and analysis of the evidence, such books and other papers as were furnished, and in his report he finds:

240 F.—29

"The bankrupt conducted a general mercantile business at Weldon, N. C. His books were kept by his sister. He could not read nor write. While he has been in business for several years, his only book of record seems to run from January 1, 1916, only. He destroyed all of his invoices by burning them immediately before bankruptcy. The book shows but little, except some accounts of some peddlers. While he kept a bank account, a large part of the money taken in from his business was not deposited in the bank. During the spring, April, 1916, the bankrupt went to Lynchburg, Norfolk, Philadelphia, and New York, where he made statements to persons and firms from whom he purchased goods, showing his financial condition. In these statements he represented that he had a stock of goods on hand, March 1, 1916, amounting to about $4,000, and owed no debts. Between March 1, 1916, and May 4, 1916, it appears upon his own evidence that the bankrupt bought goods amounting to $5,500, all of which were shipped and delivered to him at Weldon and none of which have been paid for." In his petition and schedules he states that he had only $700 worth of goods on hand, and no other goods, or other property, except cash from a bank balance of $20.20, have been received by the trustee. "The goods found by the receiver are largely old stock and in very poor condition. The weekly sales, estimated by the bankrupt and his sister, including peddlers' accounts, between January 1 and May 1, 1916, are put at $300; exclusive of peddler accounts, $75."

The referee has made analytical statements, based upon the bankrupt's own evidence and estimates, showing what amount of goods he had on hand and received, what amount of sales he made, the expenses incurred, and the amount of accounts found on his books, from which he draws the following conclusions:

"The referee is clearly of the opinion that the bankrupt has defrauded his creditors. It is beyond all human possibility that a man can have on hand March 1, 1916, $4,000 in goods, buy $5,500 by May 4, 1916, and pay no creditor a cent, and have left only $900 in goods on May 4, 1916, when he voluntarily goes into bankruptcy, having only $1,794.61 due him on his books."

There appears on the book produced by the bankrupt a number of accounts for goods alleged to have been sold to peddlers, aggregating some $6,000. The book was produced on this hearing. The accounts have, from any and every viewpoint, the appearance of being "manufactured." There is evidence strongly sustaining the suggestion that they were "raised" on the books after the adjudication, and before the books were turned over to the court and its officers. The evidence amply sustains the conclusion of the referee, who says that he—

"does not believe these accounts are bona fide. It is inconceivable that anybody would sell over $6,000 of goods on a credit to men who were almost absolute strangers, many of whom he knows nothing about. If such sales were made, the bankrupt acknowledges receiving a considerable amount of cash which is unaccounted for."

The referee, in his report, makes and notes reference to the particular portions of the testimony upon which his findings are based:

"The referee therefore finds as a fact that the bankrupt, J. A. Elias, has concealed from his creditors and is withholding from the trustee of his estate $4,047.90 in merchandise, or its equivalent in money, and that the bankrupt either has this property in his possession, or under his control, and that he should forthwith turn it over to the trustee."

Upon this finding he makes the order, etc.

The bankrupt, in his answer to the rule to show cause, contends that the conclusions of the referee are based upon deductions which are not

sustained by the evidence. While it is true, as stated by the referee, many of his findings in regard to amount of sales and disposition of the proceeds are estimates, they are all based upon the evidence of the bankrupt and upon the view of it most favorable to him. The quantity and value of the goods on hand, March 1, 1916, is given by the bankrupt, in statements made during the month of April, 1916, as a basis of credit for the purpose of buying goods. It may be that he overestimated the stock. There is other evidence, from witnesses who had the opportunity of estimating in a general way the stock, which would tend to show that it amounted to as much as $3,000. There is no controversy in regard to the amount of goods purchased between March 1, 1916, and May 4, 1916. The evidence is conclusive in respect to them. If there is uncertainty in regard to amount of sales, cash receipts, and the disposition made of it, the bankrupt has no just cause to complain, as it was his duty to furnish to the court the evidence in that respect. Especially is this so when the referee has adopted such estimates as he furnishes and given to them the conclusion most favorable to him. The bankrupt concedes that his stock on hand, March 1, 1916, was worth as much as $2,250 to $2,500. He does not seriously contend that his sales were larger than found, or that he has in any manner accounted for the proceeds thereof.

The referee has been very liberal in the allowance of expenses and support of the family of the bankrupt. There can be no reasonable doubt that the bankrupt, when filing his schedules, withheld from his schedules, and from his trustee, goods and merchandise amounting to several thousand dollars. Adopting his estimate of amount on hand as being $2,250, there is a shortage of $2,297, for which he gives no account.. The evidence in regard to his conduct from March 1, 1916, when he had, as he represented to those from whom he was seeking credit, $4,000, and now says $2,250, and owed no debts, until May 4, 1916, during which period he bought goods on credit, amounting to $5,500, for which he has not paid $1, is incapable of any explanation otherwise than that he concealed either the goods or their proceeds from his creditors, and had them on hand, or under his control, when he filed his schedules. The schedule shows debts, $5,149; stock on hand, $700, from which he claims his exemption of $500; open accounts, $3,500, which are fraudulent, and, if valid, worthless. The entire indebtedness was contracted between April 1, 1916, and May 1, 1916. He burned his invoices just before filing his petition. He says he did this because Mr. Gaskill, the former referee, who took a list of them, told him that he had no further use for them. Mr. Gaskill has since that time died. The manifest effort to account for goods by "raising" accounts against the peddlers is too obviously fraudulent to impose on any intelligent person. It is in evidence that the bankrupt turned over the goods allotted to him from the stock, as his exemptions, to his wife, who opened up, and is now conducting, a mercantile business in the same storehouse occupied by the bankrupt, which is owned by his mother; that one Rabill, a Syrian merchant, in Weldon, N. C., holds a mortgage on the stock of goods with which the wife is conducting business.

The power to enforce obedience, by bankrupts and others, of all lawful orders, by fine, or imprisonment, or fine and imprisonment, is conferred by Congress in section 2 (13) of the Bankruptcy Act. Collier, 18, § 41; Collier, 619. The power to enforce obedience to lawful orders made by the referee is conferred upon the judge. The procedure prescribed in that section has been followed in this case. If the bankrupt is charged with fraudulently concealing his property from his trustee, or making a false oath in relation to proceedings in bankruptcy, he is liable to indictment, and, upon conviction, punished as prescribed by section 29 of the act. This, of course, involves the necessity of finding a bill of indictment by a grand jury and conviction by the verdict of a petit jury. The present proceeding is based upon the finding by the referee that the bankrupt has, in his possession or under his control, the goods, money, or other property which he is ordered to deliver to the trustee. The procedure prescribed and followed in this case requires that the order of the referee, giving him a reasonable time within which to comply with it, be served on the bankrupt. He may, if so advised, file a petition for review of the finding of the referee, as in other cases. Bankr. Act, § 39. If he does not file such petition, or, if filed, the order of the referee is confirmed by the judge, and the bankrupt fails to comply with or obey the order, the referee certifies his findings, together with the order, to the judge, and upon a day fixed by him, of which notice is given the bankrupt, an order is made by the judge that the bankrupt show cause why he shall not be attached for contempt. This has been done here.

The questions which have given me concern are: (1) The extent to which the findings of fact by the referee are conclusive upon the judge. (2) The extent to which the question of present ability on the part of the bankrupt to comply with the order may be inquired into by the judge. The decisions made by the several federal judges, in regard to both questions, are to some extent conflicting. I do not find that the questions have been decided by either the Supreme Court or the Circuit Court of Appeals of this circuit. Because of the attitude taken by the bankrupt in his answer to the rule to show cause, and the condition of my mind in regard to both questions, I find it necessary to examine the variant decisions, and pursue such course as seems to me in accordance with a correct interpretation of the statute and general principles applicable to proceedings in contempt cases.

[1] It will be well to note the distinction, always observed, between orders attaching persons charged with contempt, by the commission of an act, in the presence of the court, interfering with its orderly procedure, or such acts, not in the presence of the court, but interfering with the enforcement of its judgments, decrees, and proceedings, and those instituted for the purpose of enforcing obedience to the decrees of the court.

In Re Chiles, 22 Wall. 157, 22 L. Ed. 819, Justice Miller, after pointing out the distinction, says that in the latter case:

"The party refusing to obey should be fined and imprisoned until he performs the act required of him or shows that it is not in his power to do it."

Assuming that the bankrupt had in his possession, at the time he filed his petition, the goods, or proceeds thereof, and withheld them from his schedule, or concealed them from his trustee, he is subject to indictment, and, upon conviction by a jury, punishment as prescribed by section 29 (1), or for making a false oath (Id. 2).

It was suggested on the argument that it was within the power of the court to punish in this case, by imprisonment, for contempt. I do not deem it necessary to discuss this phase of the case, because, if the power be conceded, I do not think that in such cases it should be exercised. Whatever distinction may have been drawn by courts in balancing arguments advanced to sustain conflicting views as to whether a contempt proceeding is civil or criminal, it is, when used as a means of punishment, for all practical purposes punitive, and, when the act complained of is made by statute criminal, the person charged should be prosecuted "by due process of law," by indictment and trial before those tribunals, grand and petit juries, with all of the safeguards which are guaranteed to the citizen by the Constitution and laws when his liberty is involved. I concur in the concurring opinion of Judge Shelby, in Stuart v. Reynolds, 204 Fed. 709, 123 C. C. A. 13, and this, I think, is sustained by the great weight of judicial opinion as expressed by our judges.

[2] In this proceeding, therefore, the question of punishment for acts committed by the bankrupt will be eliminated and left to such course as the government may see fit to take by indictment and trial according to the course and practice prescribed in criminal proceedings. The sole viewpoint in which the case will be considered is as a proceeding, provided by the statute, for the purpose of enforcing obedience to a lawful order of the referee. That he had the power to make the order is conceded. The bankrupt not having asked for a review of his findings and the order made upon them, the first question arises: What may the bankrupt now urge, and, at this state of the proceeding, what may the court consider, in opposition to the motion of the trustee that an order of committal be made? The question is very clearly stated by Judge Hand. In re Frankel (D. C.) 184 Fed. 539. Upon the first argument, the judge says that he was not clear in his mind that the referee correctly found that "at that time the bankrupt had property concealed." He denied the motion to commit him for contempt. Upon a second argument, the learned judge, for the reasons stated by himself, concluded that he was bound by the finding of the referee that the bankrupt had, at the time the order was made, the property concealed, and that the only defense open to the bankrupt, upon the motion to commit for failure to obey the order, was that "since the date of the order he had lost ability to comply with it," or that the order of the referee commanding the delivery of the property was a conclusive estoppel upon the date of its entry, and "left open to the respondent only the issue of showing what he has done with the money since that time." Judge Hand interprets the opinion of Judge Lacombe (In re Stavrahn, 174 Fed. 330, 98 C. C. A. 202, 20 Ann. Cas. 888) as so deciding.

The question does not very clearly appear to have been presented upon the record. One of the exceptions, made by the bankrupt to the action of the District Judge, was that he "erred in holding that he was bound by the order and certificate of the referee, and therefore could not consider the affidavits submitted on behalf of the bankrupt." It appears that, upon the motion to commit the bankrupt for failing to obey the order, "the record book, comprising the evidence, and all other papers, were handed up for the information of the judge. Hearing thereon, and on the two affidavits then submitted by the bankrupt, was had on February 8, 1909," resulting in the approval by him of the order. Judge Lacombe says that the court did not find in the record sufficient evidence to support the allegation that the District Court held that it could not consider the affidavits submitted by the bankrupt; that the court inferred from the record before it that the District Judge read the affidavits and "reached the conclusion that they did not meet the case presented in the moving papers." The contents of the affidavits do not appear. It is manifest that the explanation offered by the bankrupt for not complying with the order was not deemed sufficient; but it does not appear whether he offered to show that he did not, prior to or at the time the order was made, have the property, or had thereafter disposed of it.

Judge Hand's construction of the opinion was doubtless correct; at least he regarded it as of controlling force with him, although it is quite evident, from the concluding words of his opinion, that he was not fully persuaded that his first conclusion was not correct. The importance of the conclusion reached is illustrated by Judge Hand's course in the Frankel Case. Upon the second hearing, logically following his construction of the decision of the Circuit Court, he passes the order of committal upon the referee's finding that, at the time the order was made, the bankrupt had the property in his possession, without considering or passing upon the question of his "present ability to comply" with the order. This he regards as foreclosed, unless it was shown that, since the date of the order, he had lost ability to comply. It is manifest, from his language in regard to the decision in Re Davison (D. C.) 143 Fed. 673, to be noted later, that he did not think the question decided by Judge Brown, in that case, open to him. Judge Lacombe (In re Stavrahn, supra), recognized the right of the bankrupt to have notice of the motion to attach for contempt for failure to obey the order, to have his "day in court," and an opportunity to be heard, to make his defense; but the question arises: What may he say in his defense —that he did not have the property when the order was made by the referee, or only that since that time he has become disabled to deliver it?

By some of the courts it is held that, unless he asks for a review of the findings of the referee, he is estopped, upon the hearing of the motion to commit, to say that the referee was in error, and restricted to showing that, since the making of the order, he has lost his ability to deliver them. It is conceded, by all of the decisions, that before an order of commitment is made the judge must find that "the bankrupt has the present ability to comply with the order of the referee." In re

Marks (D. C.) 176 Fed. 1018. The question arises whether he may, for the purpose of showing that he has not the *present* ability, show that he did not have such ability when the referee found that he had the property and ordered him to deliver it to the trustee, or only that his inability has arisen since the order was made. In re Mayer (D. C.) 98 Fed. 839, the bankrupt filed a petition for review. Judge Seaman discusses the findings of the referee. This was manifestly correct. In Re Davison (D. C.) 143 Fed. 673, it appeared that the referee found that the bankrupt had in her possession, and concealed from the trustee, property to which he was entitled. He made an order directing her to turn over the property to the trustee. The bankrupt filed a petition for review, upon which the finding of the referee was sustained and his order approved. Thereafter the order was certified to the judge and an order of commitment asked for. In response to a notice to show cause, the bankrupt filed an answer containing "a reiteration of her denials, made before the referee, that she had concealed property belonging to the estate. It also set up that she had no property or money in her possession or control belonging to the bankrupt estate. She also averred that she "had no money, property, or means to enable her to comply with the order of the court," etc. Judge Brown says that a part of the statements are inconsistent with the findings of the referee, approved by the court, but says:

"It is not necessary, however, to decide whether, upon contempt proceedings, the bankrupt is concluded as to matters involved in a former hearing, * * * since a portion of the bankrupt's answer relates to her present ability to comply with the order of the court."

It is manifest, however, that the judge considered and discussed the question whether, at the time the order was made, she had the property in her possession or control. He gives to the finding of the referee its full probative force, but says:

"It does not seem to me that the question of the present ability of a bankrupt to comply with an order should be determined upon an artificial rule of proof, to be applied irrespective of the circumstances in a particular case."

Because he found himself "in very serious doubt as to the present ability of the bankrupt to comply with the decree" the learned judge denied the order to commit the bankrupt.

In re Goodrich, 184 Fed. 5, 106 C. C. A. 207 (C. C. A. 5), it is held by Putnam, Judge:

"It is sufficient that we apply the principle that a judgment against a person in a civil case sustains none of the issues against the same person in criminal proceedings. In the present instance the order reported by the referee, and whatever occurred before him, may, under the liberal rules we have stated (In re Cole. 144 Fed. 392 [75 C. C. A. 330]; 163 Fed. 180 [90 C. C. A. 50, 23 L. R. A. (N. S.) 255]), be referred to as having some weight pro and con; but this cannot be accepted as justifying the District Court from failing to revise, on a proceeding like this, the question involved with an open mind. That court was holden to receive all material proofs relating to what preceded the referee's report, as to what followed it."

In that case the District Judge "substantially ruled out all evidence which might have been produced before the referee, and apparently all which related to the issues tried by the referee," and confined the evi-

dence to what occurred after the referee's report. The cause was recommitted to the judge for further proceedings. It will be noted that Judge Brown sat in the hearing of this case. Judge Dodge, who made the order in the Goodrich Case, in the contempt proceeding, says:

"It must be made to appear affirmatively that when the order was made the bankrupt had power to obey it and that the failure to obey was willful."

The decision made in Re Cole, 163 Fed. 180, 90 C. C. A. 50, 23 L. R. A. (N. S.) 255, is the controlling authority in the First Circuit. In Re Marks (D. C.) 176 Fed. 1018, Judge McPherson denied the order because he found that the bankrupt was then unable to comply with the order of the referee. In Re Nisenson (D. C.) 182 Fed. 912, Judge Rellstab reviews the evidence and finding of the referee. He grants the order to commit for nonproduction of a part of the property and denies it as to the remainder. In re Cummings (D. C.) 188 Fed. 767. The question does not appear to have been definitely settled in the Third Circuit. Judge Sessions, in Re Haring (D. C. W. D. Mich.) 193 Fed. 168, says that he finds no controlling decision in the Sixth circuit. He therefore "adopts the view which seems to be more consonant with reason," saying that there are two distinct lines of decisions founded upon different and divergent conceptions of the law. He collects and cites those cases, many of which I have cited, holding that the finding of the referee that, at the time he makes the order, the bankrupt has in his possession, or under his control, property which he unlawfully withholds from the trustee, is conclusive upon the judge, and those which hold that, in proceedings against the bankrupt for contempt for failure to obey the order, the findings of the referee are given due weight, but that the judge should make a new and independent investigation, and should consider all material evidence relating to what preceded as well as what followed the referee's order, and from such evidence determine whether the bankrupt has the present ability to comply with the order and contemptuously disobeys it. For the reasons stated, the learned judge adopts the view of the decisions last cited.

[3] In this condition of the decided cases, I am compelled to resort to general principles and the reason of the thing. It is conceded that the findings of the referee, and his order, should be given very much weight upon the motion to commit for contempt. It is further conceded that no order should be made by the judge unless he finds, either by adopting as conclusive the findings of the referee, or otherwise, that the bankrupt has the present ability to comply with the order. If he is concluded by the findings of the referee, the order to commit passes as of course, unless the bankrupt can show that, since the order was made, he has become unable to comply. If this be the correct rule for the guidance of the judge, he must find, as a fact, that the bankrupt has the present ability to comply with the order, not because he believes it to be true, or has, by independent investigation of the evidence before him, reached that conclusion, but because the referee has so found, and the bankrupt is not able to show loss of ability since the time the order was made. He may, as Judge Hand did in the Frankel Case, believe that the bankrupt did not, at the date of the order of the ref-

eree, have in his possession, or conceal, the goods, and yet be compelled to find present ability to comply, because there has been no change in the ability of the bankrupt since the order was made. Of course it is clear that a judge may, in many instances, be compelled to declare the law upon a state of facts found by the trier of the fact—which he does not believe to be true. This is necessarily so in any system of ·procedure, in which the duty of finding the facts is imposed upon a judicial agency, and the duty of declaring the law upon another, both being constituent elements in the composition of the court. The present ability to comply with the order is a question of fact, which the judge must find before he is authorized to declare the party in contempt. I am impressed with the language of Judge Sessions, supra. He says:

"To hold that the investigation by this court of respondent's guilt, or innocence, must begin where that of the referee terminates, is to deprive this court of the discretion vested in it by law, and to confer upon the referee the power to do indirectly that which he cannot do directly"

—or, as said by Judge Brown, to give an uncontrolled power "to an artificial rule of proof to be applied irrespective of the circumstances of the particular case." It is to convert the judge into a more executive officer, with no power of investigation .or adjudging in regard to the fact upon which he makes an order which deprives, in a summary proceeding, a citizen of his liberty. I am not inadvertent to the fact that the bankrupt may have the findings of the referee reviewed upon a petition therefor.

[4] Because of its drastic character, and of necessity, its summary method of procedure, the law requires the court to find, in all cases, the facts upon which orders of imprisonment for contempt are made. I am constrained to reach the conclusion that, before I can find as a fact that the bankrupt has a present ability to deliver to the trustee either goods or money, I must, by examining the evidence upon which the trustee based the order and the answer filed to the rule, find whether he had such power when the order was made. The instant case is a striking illustration of the difficulty found in adopting the other view. The respondent was adjudged bankrupt May 4, 1916. He was examined soon thereafter, but by reason of the course pursued by the referee, who has since died, no further proceedings were had until February, 1917. There is abundant, and to my mind conclusive, evidence that, at the time of filing his petition, the bankrupt had either in his own possession, or the possession of confederates, goods of considerable value in excess of that found by the referee. I am not, however, by any means certain that he had, on the day the order was made, or now has, either the goods or the money for which they were sold. If, as held by several courts, I must find, beyond a reasonable doubt, that the bankrupt has the present ability to deliver the goods or the money, I would encounter very serious difficulty in doing so. I find no evidence that his condition has changed, or his ability lessened, to do so since the order was made. He makes no pretense or suggestion to that effect. Having reached this conclusion, I have examined the findings of the referee, and the evidence sent up by him, and endeavored

to reach a conclusion satisfactory to my own mind in regard to his present ability to comply with the order.

[5] I am confronted here with equally divergent views of eminently respectable courts. It is conceded, and correctly so, that the findings of the referee are entitled to, and should be given, great weight. This I am prepared to do, because of my concurrence in the rule and my confidence in the judgment of the referee and the intelligent and eminently just manner in which he has dealt with the bankrupt. I may say, further, that I do not doubt the correctness of any conclusion reached by him, until I reach that in which he finds that the bankrupt was, at the time he made the order, February 1, 1917, "withholding from the trustee of his estate $4,047.90 in merchandise, or its equivalent in money, and that the bankrupt either has this money in his possession or under his control." He was necessarily compelled to find, in the alternative, that it was either goods or money. It is at this point that, as said by Judge Brown, I find myself in very serious doubt whether he had either, and, if either, which. Of course, if I was reasonably certain that he had the goods or money on February 1, 1917, I should have no difficulty in adopting the rule prescribed by Judge Lacombe (In re Stavrahn, supra) that it is incumbent on him to give some reasonable explanation as to why it was that he did not turn it over to the trustee in compliance with the order; it would be for him to explain how and why it was that these goods, or this money, in his possession two months ago, has disappeared. In Re Nisenson (D. C.) 182 Fed. 912, Judge Rellstab says:

"The burden is upon him to satisfactorily account for its nonproduction, but in assuming such burden he, because of the drastic means that may be invoked to enforce the order to turn over (imprisonment for contempt) is entitled to the benefit of the reasonable doubt."

In Re Marks, supra, Judge McPherson declined to order imprisonment because he could "not escape from the conclusion that the bankrupt is now unable to comply with the order."

Upon a careful examination of many of the decided cases, it would seem that the courts have no invariable rule in regard to the burden of proof, by which they are governed in such cases. It is undoubtedly true that, as a rule of law, based upon experience, when property is found in the possession of a person, a presumption of fact arises that he continues to have it; the strength of this presumption, or rather inference, is dependent upon so many conditions that it is of little value in determining the ultimate fact. There is a very strong presumption in this case that the bankrupt had the goods which he purchased during the month of April, 1916, on May 4th of the same year, when he filed his petition; but, in view of all that occurred between that date and February 1, 1917, and the character of the property, the presumption would be very weak that he had it February 1, 1917— hardly sufficient to justify an order of imprisonment to continue until he surrendered them.

A number of difficulties arise before we can, by presumption, find that he had the money February 1, 1917. There is no evidence that the goods were sold, and no suggestion when, or for what sum, or to

whom they were sold whether immediately after filing his petition, or immediately before the order was made. It is difficult to do more than say "I have serious doubt" whether he now has either the goods or the money; nine months have passed since he filed his petition; the bankrupt is a very ignorant Syrian, a peddler, unquestionably a fraudulent bankrupt, and unworthy of credit, guilty of crime for which he may be punished; but non constat that he now has the ability to deliver to his trustee $4,000 worth of merchandise or its equivalent in money. There is nothing in this record stirring sympathy for him or his conduct; but I cannot, for that reason, imprison him as punishment, nor, unless I find that he has the present ability to do so, imprison him for contempt.

[6] Another difficulty confronts me in enforcing the order by imprisonment. The order may not be based upon the theory that he has other goods, or that he has sold those which he had, and used the money, and therefore owes the trustee that amount. As said by Maxey, Judge, in Samel v. Dodd, 142 Fed. 68, 73 C. C. A. 254:

"The present proceeding is one of a summary nature, and is invoked for the purpose of bringing within the reach and control of the bankruptcy court specific property found to be in the possession of the bankrupt and by him unlawfully withheld. The order should describe the property with reasonable certainty in order to assure its identity, and the command of the court to the bankrupt should be to surrender the very property sought to be recovered. * * * It is not within the power of the court, in such a proceeding, to render judgment for the value of property ascertained to be in the possession of, and contumaciously withheld by, a bankrupt, and attach him for contempt upon his refusal to pay."

In Re Reynolds (D. C.) 190 Fed. 967, Judge Jones said:

"While the evidence leaves no shadow of a doubt that the bankrupt had goods of that value ($19,722.96) for which he has not accounted, or has converted into money, and that at one time he had them under his control, I do not think the proof sustains the referee in the finding that at the time of the order, or at the time of his examination, the bankrupt still had in his possession, or under his control, either the goods or the money. After a very diligent investigation of his affairs, no proof is offered showing the disposition of any specific goods, or tracing to him the possession of any considerable sum of money, or other evidence offered of such conduct as indicates that he now has any of the goods, or money derived from their conversion, in his possession or under his control."

This language appropriately describes the conditions found in this record. The order denying committal was affirmed. Stuart v. Reynolds, 204 Fed. 709, 123 C. C. A. 13, Judge Meek saying that:

"In such a proceeding the court was restricted to ordering a return of the goods and merchandise in specie or kind, and this only when it was made clear by proof that the bankrupts were in possession or control of them."

Judge Shelby, who had given the subject much thought, as indicated in his dissenting opinion in Re Purvine, 96 Fed. 192, 37 C. C. A. 446, and concurring in Samel v. Dodd, supra, wrote an exhaustive opinion in Stuart v. Reynolds. The subject seems to have been fully considered in the Fifth circuit, and there it is well settled that the judge is required to consider all of the evidence before the referee

as well as that before himself—that no order of committal should be made unless he is fully satisfied that the bankrupt at the time the order was made, as well as at the time the case is heard upon the order to show cause, has in his possession or under his control the specific property to which the trustee is entitled. The concurring opinion is exhaustive and puts the judge's view strongly. The latest case which I have found, Epstein v. Steinfield, 210 Fed. 236, 127 C. C. A. 54 (C. C. A. 3d Cir.) holds that:

"An order, requiring a bankrupt to deliver property alleged to have been withheld from his trustee, should only be granted in case it appears that the bankrupt is physically able to deliver the property."

In that case (In re Epstein [D. C.] 206 Fed. 568) Judge McPherson says:

"I have considered the evidence, and approve the findings and order of the referee."

He, however, modified the order by stating, specifically what articles were found to be in the possession of the bankrupt and which he was ordered to deliver to the trustee. He evidently did not concur with the opinion of Judge Shelby, in respect to the burden of proof. There is not before me, nor was there before the referee, any evidence of conduct on the part of the bankrupt throwing light on the present possession or disposition of the goods since he filed his petition; nor is there any evidence that he had had, or invested, money. I thought that, probably, the purchase money of the house owned by his mother, might have come through this channel; but it is conceded that this was paid before the transactions involved in his bankruptcy. It seems also impossible to trace any other connection of his wife's business with the goods, except that he turned over his exemptions to her. It appears that one Rabill holds a mortgage on her stock, which is not very large; there is no suggestion of any fraud in that transaction. The conclusion that he had the goods or their equivalent, in money, on February 1, 1917, or at this time, is based upon the presumption or inference of his possession of them May 4, 1916. Discarding his answer and looking at the question from the reason of the thing, reasonably natural deductions based upon what is apparent, I would find difficulty in reaching the conclusion that he now has the specific goods which I feel certain he had May 4, 1916, or the specific money which he received for them, if sold. To find that he now has the money would require a presumption that he sold the goods, and a further presumption that he received $4,047.90 in money for them, and the further presumption that he had, and now has, the identical money which he received. This would violate a well-known rule of evidence which forbids the indulgence of a presumption upon a presumption.

While I can well understand the difficulty which the intelligent referee found in reaching the conclusion that the bankrupt had the specific goods in his possession, I am of the opinion that an order based upon an alternative finding cannot be made the basis of an order of

commitment for contempt. I do not doubt that if he had sold the goods and held the proceeds that he could be required, in this proceeding, to surrender the money received, or if he had taken a note for the price, or exchanged the goods for other property, which he then held, that he would be compelled to surrender either to the trustee, but that the order must be based upon a finding that he had the goods or the specific thing which he received for them. It is to be regretted that, by reason of conditions for which the trustee was in no way responsible, the proceeding was not brought to a conclusion earlier, when it is not improbable the bankrupt had the goods either in his possession, or under his control and an order of imprisonment would have been an effectual remedy to the creditors who have been defrauded by the bankrupt. However this may be, courts must not use the remedies afforded by the law for any other purpose than prescribed; a remedial process may not be used as a means of punishment, without violating first principles and constitutional guaranties, essential to the preservation of due process of law and by precedent weakening their integrity.

I have examined the cases cited by counsel for the trustee. In re Jacobs (D. C.) 147 Fed. 797, was a petition for discharge; no question of contempt was involved. In re Averick (D. C.) 170 Fed. 521, was on a petition for review of the findings of the referee; the question of present ability to comply with the order was not presented. In re Hershkowitz (D. C.) 136 Fed. 950, the District Judge ruled that he was concluded by the findings of the referee. The other cases discuss the question of power in the referee, which is conceded. In the absence of any controlling decision in this circuit, and in view of the conflicting decisions in other circuits, I reach the conclusion that, upon the motion for an order of commitment, for failure, by the bankrupt, to obey the order of the referee to turn over property, or pay over money alleged to be withheld from his trustee, the judge must find, not beyond a reasonable doubt, but by a preponderance of the evidence, that the bankrupt has the present ability to comply with the order. That in doing so he must, giving due weight to the finding of fact by the referee, examine for himself the evidence in regard to the conduct of the bankrupt and all other relevant evidence before and since the passing of the order by the referee. That the order of the referee should find what specific property is in the possession of the bankrupt or under his control, and with a reasonable degree of certainty specify the property which he is ordered to deliver, or, if money is directed to be paid, the order should specify the amount and source from which it is derived.

Guided by these principles, I am constrained to deny the order imprisoning the bankrupt for contempt.